MATTER OF SZEGEDI

In DEPORTATION Proceedings

A–11575482

*Decided by Board August 10, 1962*

"Homicide by reckless conduct" in violation of section 940.06, Wisconsin Statutes, is not a crime involving moral turpitude.

CHARGE: Act of 1952—Section 241(a)(4) [8 U.S.C. 1251(a)(4)]—Convicted of crime within five years after entry.

Respondent is 34 years old, single, male, a native and citizen of Hungary, whose only entry into the United States was on February 10, 1959 as a refugee-escapee under the Act of September 11, 1957. He was convicted on September 17, 1961 for the crime of "Homicide by Reckless Conduct contrary to the provisions of section 940.06 Wisconsin Statutes", and was sentenced to confinement in the Wisconsin State Prison for an indeterminate term of five years. At the time of hearing he was confined in this institution. The special inquiry officer found that the crime for which respondent was convicted was not a crime involving moral turpitude, ordered the proceedings terminated, and certified the case to this Board for final decision.

The District Attorney for Racine County, Wisconsin filed an information against respondent charging that on December 26, 1960 he did "feloniously cause the death of Ference Pinter by conduct imminently dangerous to him and evincing a depraved mind, regardless of human life, contrary to the form of the statute section 940.02".[1] Respondent plead not guilty and was tried before a jury which returned a verdict of guilty of the crime of homicide by reckless conduct.[2]

---

[1] Wis. Stat. Ann. 940.02 provides: "Second-degree murder—Whoever causes the death of another human being by conduct imminently dangerous to another and evincing a depraved mind, regardless of human life, may be imprisoned not less than 5 nor more than 25 years."

[2] Wis. Stat. Ann. 940.06 provides: "Homicide by reckless conduct—(1) Whoever causes the death of another human being by reckless conduct may be fined not more than $2,500 or imprisoned not more than 5 years or both. (2) Reckless conduct consists of an act which creates a situation of unreasonable risk and

It is so well established as not to need elucidation, that this Board has no authority to retry a criminal case. In making our decision we may look only to the record, consisting of the information (or indictment), the plea, the verdict, the sentence, and the pertinent statutes, in determining whether or not the crime for which respondent was convicted was a crime involving moral turpitude, as that term is interpreted by judicial and administrative decisions. Therefore, the special inquiry officer did not inquire deeply into the circumstances behind the commission and conviction for this crime, and properly so.

However, the special inquiry officer did ask respondent what happened that resulted in the death of Pinter Ference (p. 6). Respondent answered that there were three men in respondent's room: the deceased, who was respondent's best friend, respondent, and a third person. Respondent stated that he was demanding money he had loaned to the third person, that the third person refused to pay back the money, that the deceased took respondent's shotgun, and tried to hit respondent with the gun. "In the scuffle, my hand was also broken, and while we were arguing and scuffling, the three of us, the gun went off and Pinter Ferenc was shot. I did not have the gun in my hand." The record does not show the evidence developed in the criminal proceeding.

The precise question for determination by the Board is whether or not the crime of "homicide by reckless conduct" under the Wisconsin Statutes is a crime involving moral turpitude. The special inquiry officer quoted the definition of such a crime from *Wing* v. *United States*, 46 F. 2d 755 (7th Cir. 1931), that it is an act of baseness, vileness or depravity in the private and social duties which a man owes to his fellow men, or to society in general, contrary to the accepted and customary rules of right and duty between man and man. The special inquiry officer concluded that while a man committing such an act (as that described by section 940.06) may be guilty of conduct which is contrary to the accepted and customary rules of right and duty between man and man, the crime as defined by the statute need not be accompanied by a vicious motive or a corrupt mind. The special inquiry officer says there need be no intent to cause death or inflict serious injury, and concluded that the crime for which respondent was convicted did not involve moral turpitude.

Prior decisions of the Board that arose under provisions of the codes of states other than Wisconsin, are not precisely in point, because the offense of "homicide by reckless conduct" is a statutory offense

---

high probability of death or great bodily harm to another and which demonstrates a conscious disregard for the safety of another and a willingness to take known chances of perpetrating an injury. It is intended that this definition embraces all of the elements of what was heretofore known as gross negligence in the criminal law of Wisconsin."

without a counterpart in the common law, or in most codes, so far as we can discover. The leading Board decision is *Matter of S—*, 2 I. & N. Dec. 559 (B.I.A., November 1946; A.G., July 1947). The alien therein was indicted on two occasions for murder in the second degree, the indictments alleging that on each occasion he "unlawfully, purposely and maliciously killed" another person. On each occasion (first in 1926 and again in 1943) the alien pleaded guilty to the lesser offense of manslaughter and was sentenced to serve an indeterminate term of imprisonment. Since the Ohio statute included both voluntary and involuntary manslaughter within the same section of the law, making no distinction, the Board decided that the crime should be taken at its minimum and found that the convictions should be considered as having been for involuntary manslaughter. The Board found that the acceptance of the plea of guilty to manslaughter removed "the elements of purpose and malice and there remains only the element of unlawful killing". The Attorney General reversed the Board, finding that the manslaughter was voluntary because of the allegations *in the indictment* (which defined or related to second-degree murder), and said, "By his plea of guilty to manslaughter, the alien admitted these killings. In the absence of other evidence in the records of conviction, under the Ohio statute it is reasonable to conclude that the homicides committed by the alien were voluntary. Consequently, the crimes involved moral turpitude."

All other Board decisions in this area also concern indictments for murder, either first or second degree followed by convictions for manslaughter. In *Matter of J—*, 2 I. & N. Dec. 477 (B.I.A. 1946), the alien was convicted of "assault with intent to commit manslaughter" in Florida. The Board held on the basis of decisions of the Supreme Court of Florida that this offense could only include voluntary manslaughter, because it required "an intent to commit" the act, and there could be no intent to commit involuntary manslaughter. It was, therefore, a crime involving moral turpitude.

In *Matter of B—*, 4 I. & N. Dec. 493 (B.I.A. 1951), the Board found that the New Jersey statute included both voluntary and involuntary manslaughter, that the record did not disclose sufficient details or circumstances surrounding the killing of B—, and that there was no indication that respondent had been convicted of voluntary, rather than involuntary, manslaughter. A dissent was recorded on the ground that the Attorney General's decision in *Matter of S—*, *supra*, 2 I. & N. Dec. 559, the Ohio case, should control.

In *Matter of H—R—*, 4 I.&N. Dec. 742 (B.I.A. 1952), the information charged the alien with murder (wilfully, unlawfully, feloniously, and with malice aforethought having killed a human being) and at the time of the commission of the offense being armed with an auto-

matic revolver. The court found the alien guilty of manslaughter. The California Code, section 192, at the time of the alien's conviction defined murder and two kinds of manslaughter. The alien was clearly charged in the information with a voluntary killing, and there was no evidence in the record to support a finding of involuntary manslaughter. In the light of the Attorney General's decision in *Matter of S—*, we concluded that the homicide committed was voluntary, and therefore involved moral turpitude.

The instant case is not governed by the Attorney General's decision in *Matter of S—, supra*, 2 I. & N. Dec. 559, because the offense of which · Szegedi was convicted was not designated manslaughter, but homicide by reckless conduct, a statutory offense within the Wisconsin Code. From the maximum penalty provided by the statute, it is apparent that this is a lesser crime than manslaughter. Section 940.05 provides a maximum penalty for manslaughter of not more than 10 years. Section 940.06 provides a maximum penalty for homicide by reckless conduct of not more than $2,500 fine, or imprisonment for not more than 5 years, or both.

At present the Wisconsin Code provides ten degrees of Crimes Against Life, including Abortion and Assisting a Suicide. There are three degrees of Murder (sections 940.01–03), and the section on Manslaughter has four subsections.[3] Section 940.06 with which we are concerned is set forth in footnote 2, and requires and defines "*gross negligence.*"

For first degree murder all the statutory elements must be present: That is, (1) an act "imminently dangerous to others" and (2) "evincing a depraved mind, regardless of human life," and (3) a "premeditated design to effect the death of the person killed or any human being." *Radej v. State*, 152 Wis. 503, 140 N.W. 21 (1913). The Wisconsin second-degree murder statute eliminates the "mental purpose to take life." *Zenou v. State*, 4 Wis. 2d 655, 91 N.W. 2d 208

---

[3] 940.05, Manslaughter: Whoever causes the death of another human being under any of the following circumstances may be imprisoned not more than ten years:

    (1) Without intent to kill and while in the heat of passion; or

    (2) Unnecessarily, in the exercise of his privilege of self-defense or defense of others or the privilege to prevent or terminate the commission of a felony; or

    (3) Because such person is coerced by threats made by someone other than his co-conspirator and which causes him reasonably to believe that\ his act is the only means of preventing imminent death to himself or another; or

    (4) Because the pressure of natural physical forces causes such person reasonably to believe that his act is the only means of preventing imminent public disaster or imminent death to himself or another.

(1953), says, the "depravity" referred to in the statutory definition of second-degree murder is present as well in first-degree murder, the difference being absence of a "design" to effect death. *Walsh v. State*, 195 Wis. 540, 218 N.W. 714 (1928). The "heat of passion" reduced what would otherwise be murder to manslaughter in the second or third degree (usually third). *State v. Stortecky*, 273 Wis. 362, 77 N.W. 2d 721 (1956); *Devroy v. State*, 239 Wis. 466, 1 N.W. 2d 875 (1942).

The predecessor to section 940.06 was R.S. 4362, amended by Stat. 1898, par. 4363; later Stat. 1929, section 340.26, defining manslaughter in the fourth degree. The development of this section of the Wisconsin Criminal Code is set forth in *Bussard v. State*, 233 Wis. 11, 288 N.W. 187 (1939). Bussard was convicted of manslaughter in the fourth degree under section 340.26, which provided as follows:

*Every other killing* of a human being by the act, procurement or *gross negligence* of another, where such killing is not justifiable or excusable, or is not declared in this chapter murder or manslaughter of some other degree, shall be deemed manslaughter in the fourth degree. (Emphasis supplied.)

Prior to the amendment in 1929, the same section, Stat. 1927, 340.26, was identical with the 1929 version, except that it read, "Every other killing of a human being by the act, procurement or *culpable negligence* of another, etc.". (Emphasis supplied.) The amendment in 1929 was adopted following a request of the Supreme Court of Wisconsin in *Clemens v. State*, 176 Wis. 289, 185 N.W. 209 (1921), wherein "culpable negligence" was held to be *ordinary negligence* in that state. The court in Bussard said:

It was there pointed out that as a result of mere inadvertence a person might in this state be convicted of the crime of manslaughter with the necessary serious consequences to himself and his family. It was suggested that at the earliest time available such changes be made in the statutes of our state by the Legislature as will require, in order to convict of manslaughter in the fourth degree, gross negligence, as defined in the decisions of this court.

Gross negligence had been defined previously by the Wisconsin Supreme Court in *Jorgenson v. C. & N.W.R. Co.*, 153 Wis. 108, 140 N.W. 1088 (1913), as follows:

Gross negligence has received a very certain and definite meaning in the jurisprudence of this state, somewhat different from the meaning given to it in other states; it is not inadvertence in any degree; there must be present either willful intent to injure, or that wanton and reckless disregard of the rights of others and the consequences of the act to himself, as well as others, *which the law deems equivalent to an intent to injure.* (Emphasis supplied.)

In *Bussard v. State, supra*, the Supreme Court said that, while the defendant had been *negligent in a high degree*, it could find no evidence of wantonness, recklessness, or willfulness. *State v. Whatley*, 210 Wis. 157, 245 N.W. 93 (1932), says that evidence of gross negligence to

warrant conviction for fourth degree manslaughter under Statute 1929, section 340.26 had to warrant finding beyond a reasonable doubt that accused's misconduct was more reprehensible than mere want of ordinary care.

As to what constitutes "gross negligence", *State* v. *Wickstrom*, 14 Wis. 2d 416, 111 N.W. 2d 176 (1961), held that to justify a conviction for causing death by a *high* degree of negligence in operation of a motor vehicle, the risk must be unreasonable and probability high or greater than ordinary negligence, but not so great as to constitute "wilful and wanton conduct characterizing gross negligence".

It becomes apparent, therefore, that the view of the Wisconsin courts and Legislature is that homicide by reckless conduct connotes a degree of negligence well beyond the "high degree of negligence" and "unreasonable risk" defined in section 940.08. The Supreme Court of that state has declared on several occasions that to find gross negligence "there must be present either a *wilful intent to injure*, or that wanton and reckless disregard of the rights of others and consequences of the act to himself which the *laws deem equivalent to an intent* to injure." This might be termed "imputed intent."

Still there must not have been an intent actually to cause a death or the offense would be *raised* from manslaughter in the fourth degree. *Schlect* v. *State*, 75 Wis. 486, 44 N.W. 509 (1890), concerned a killing by defendant during a fight in a saloon. The court held that defendant might have been convicted of manslaughter in the fourth degree, under R.S. section 4362. In *Doherty* v. *State*, 84 Wis. 152, 53 N.W. 1120 (1893), the defendant was a policeman who shot deceased during a struggle. The officer placed the muzzle of a pistol against his assailant's body and pulled the trigger. The defendant officer claimed that his intent was only to disable deceased. The court found that defendant was presumed to have intended the natural consequences of his act and to have fired with the intention to kill deceased. Therefore, he could not be convicted of manslaughter in the fourth degree under R.S. 4362 which provided that to constitute the latter offense the killing must be involuntary. A similar case is *Beauregard* v. *State*, 146 Wis. 280, 131 N.W. 347 (1911), which held that when blows on the head with a gun barrel were inflicted voluntarily, regardless of consequences, although without any specific intent to cause death, the killing was not involuntary, within the meaning of Statute 1898, par. 4362, defining manslaughter in the fourth degree.

In the instant case the fact that the jury found respondent guilty, not of second-degree murder, but of the lesser offense of homicide by reckless conduct, removed the element of "depraved mind" present in 940.02, the second-degree murder statute. To recapitulate: prior Board decisions have held that voluntary manslaughter does involve

33

moral turpitude, and involuntary manslaughter does not involve moral turpitude. However, the Wisconsin Code has taken all the "Crimes Against Life" out of the common-law pattern (murder, voluntary manslaughter and involuntary manslaughter). If respondent had been convicted prior to the 1955 recodification the offense would have come within section 340.26, 1929 Statutes, defining "manslaughter in the fourth degree." The crime of homicide by reckless conduct more nearly resembles the common law offense of involuntary manslaughter than it resembles the common law offense of voluntary manslaughter. Respondent was guilty of gross negligence but, necessarily, he was found not to have had a specific intent to kill, or to do an act the natural consequence of which was to cause death.

Even if the cases have swung somewhat away from the requirement that a crime to involve moral turpitude must include such baseness, vileness or depravity as to be shocking and offensive, we still consider that voluntariness or intent to commit the act or *some* act must exist before we can find that the crime involves moral turpitude. We cannot find a case, or think of an instance, wherein the offense has been held to involve moral turpitude where no intent to commit the act existed.

The Wisconsin Legislature has by law declared that negligence so gross as respondent's, and conduct so reckless, *implies* intent and malice. Even if we believe respondent to have been *in fact* grossly negligent and reckless, does this statute describe a crime involving moral turpitude as a *matter of law?* It seems to the Board that while a legislature may in a criminal statute "impute" intent or legislate "mens rea", it cannot do so for the purpose of establishing moral turpitude under the immigration laws.

On this record we find respondent was not convicted of a crime involving moral turpitude as a matter of law. The order of the special inquiry officer will be sustained.

ORDER: It is ordered that the order of special inquiry officer of February 12, 1962 be and is hereby sustained.